Good morning. I'm Maile Hirota on behalf of the petitioner Luzviminda Colobong. I'd like to reserve one minute for rebuttal. The Board of Immigration Appeals in this case, Your Honor, adopted and affirmed the Immigration Judge's 2004 decision finding that Mrs. Colobong was ineligible for asylum, withholding, and CAT, where she had not shown a fear of persecution on account of a protected ground. Before we get to the on-account of issue, though, I'd like to note that the government concedes that the Board of Immigration Appeals made no adverse credibility finding, and where the Board does not make a specific adverse credibility finding, we must assume that Mrs. Colobong's factual contentions are true. This Court should look to its 2004 decision in Deloso v. Ashcroft, where the Court granted Mr. Deloso's petition for review with analogous facts. That petitioner also was from the Philippines. He was not sure who had committed the acts against him and his family, but he believed that it was either the Communist Party or a political enemy. Also in that case, it was mixed motive, pre-will I.D., as was Mrs. Colobong's case. And Mr. Deloso was found that he was established on account of a protected ground in both political opinion and social group, just like Mrs. Colobong is claiming. There is substantial circumstantial evidence in Mrs. Colobong's case to show that she has suffered persecution on account of a protected ground. Her husband, who was brutally murdered in public, his lengthy public service, that he held a government elected position, that he was called out of his home in the course of his official duties to establish peace and order in the community, that it was reported that he was called out by his uncle in order to restore peace and order. But the uncle's role in this is kind of a mystery, because it seems to weigh against the notion that the persecution, the undoubted persecution suffered by the late husband, was on account of political grounds, unless there's some reason to think the uncle's on the other side politically. I don't understand why that cuts against the claim. As I understand your claim, the protected ground is either political or social group slash family. Yes. And yet the uncle seems to be participating in some fashion in whatever it is that happened to the late husband. Was there not evidence in the record that, I didn't know whether it was the uncle or the cousin, was forced by five gunmen to ask for him to come out that night to restore order? Am I accurate that that's in the record? I'm not sure the record establishes that he was forced by five gunmen to come out, although we could say there's circumstantial evidence that he was forced. The uncle didn't testify, right? The uncle did not testify. So what evidence is there as to what the uncle's role was and why he did what he did? The evidence is simply that he came to the murdered husband's home and called him out to restore peace and order, and that it was reported that there were five armed gunmen, Your Honor. It was reported? I missed it last time. That there were five armed gunmen who shot the respondent's husband with 64 bullets. Were they with the uncle? I don't know, Your Honor, if they were with the uncle. Where did I find that in the record? Was it just simply a supposition of one of the witnesses? There was a note left at the scene that the NPA was responsible for the killing. There is a police blotter that the NPA was suspicious, but was the only suspect, and I believe the uncle, it was reported that there were five armed gunmen. See, the uncle's a missing piece here, and it really is a wild card because I can't figure out. The motivation may involve the uncle in some fashion, and the reason that's a wild card is that it suggests maybe the motivation has something to do with something more personal than political, and may not have to do with family, but this family's targeted if the uncle's somehow part of it. But, Your Honor, it is the Ninth Circuit law that's held that if the motivation is at least in part on a protected ground, this is pretty real ID. We don't have to show a shirt. It's not in part. It sounds much more like if it turns out to be a blood feud of some kind, then it's not in part political. Political doesn't have anything to do with it. But, Your Honor, the NPA was implicated in this murder. They left a note at the scene. There's a news article linking the killing to the NPA. There was also a note found at a neighbor's house, or excuse me, a neighbor found a note at the funeral also implicating the NPA. Does the NPA have any reason to target Petitioner? Yes, Your Honor, because Petitioner held an elected office as the Barangay Captain. Well, that's the Petitioner's husband, isn't it? Excuse me, yes, the Petitioner's husband. That's correct. And I understand that there was somebody of a similar position in a neighboring community who was shot. Yes. Was that person's spouse shot? I don't know, Your Honor. So what is it that would make for Petitioner to be concerned? Well, in this case in particular, the notes indicated that they would kill a family, and also another note specifically said that they would kill Petitioner's son. So where the, also there's a Ninth Circuit law that holds that where the killing and violence are inflicted on members of the same family by government forces, the influence that they're connected or politically motivated is appropriate. But we don't have any evidence that the violence here was committed by the government, do we? Well, it was either the NPA or a corrupt government official, Your Honor. And how do we know that? Well, the NPA was strongly implicated by the evidence that I've listed, and then the NPA, someone from the NPA did go on the radio and deny the killings and after Petitioner had reported the incident to the Human Rights Commission, she heard rumors that it was not the NPA, and she began to suspect a high government official. And there has... The counter story is that the uncle's somehow behind this. The uncle's the person that calls him out. A few minutes later, he's shot. The uncle never shows up to testify to deny involvement or explain at all how it was. He's the person that calls the victim out. So it seems to me the supposition could be just as equally argued that something's wrong between the uncle and the victim, and the uncle shoots the guy or has his friends shoot him. I don't think the uncle could have shot him 64 times that way. The uncle has friends, might have. I mean, a human being shot and the uncle presumably has friends, so how do we know this isn't all put together by the uncle? Well, that would be conjecture versus this substantial circumstantial evidence that's in the record that the uncle didn't do it. What substantial circumstantial evidence is there in the record the uncle didn't do it? The note left at the scene by the NPA that police... But you're suggesting to yourself the NPA didn't... No, Your Honor, I'm suggesting it was either the NPA or a high government official. Or someone who wants the NPA to be blamed for it. And there's no explanation as to why it couldn't have been the uncle later either. Now, who could have left a note saying it's the NPA? Now, is it a tragic situation? But the decision of the agency was that it's not established sufficiently, it was based on a protected ground. And so that's the issue I kind of dig into, and at the end of the day I'm not sure that I can reach any conclusion different than it's not clearly established what the motivation was. What were the threats that were made against the petitioner? The threat was a note found by a neighbor that the family would be killed. And she is part of the social group of the immediate Kolobong family. The other threats were specifically directed against her son. And how were these threats communicated? There was a note left at the scene and there was a note hanging that the neighbor found. What did the note at the scene say? That the NPA was responsible and that they would kill her son. They would kill her son? Yes. And what did the other notes say? That they would kill the family. And where was that found? That was found hanging nearby by a neighbor. Now, did the chief of police ever send someone to get Sinian or Simon Kolobong? Because the chief of police wanted to speak to him. Did the chief of police ever send someone? To go get the husband because the chief wanted to talk to him. I don't, I'm not sure when you're speaking, before the murder you mean? Well, he had to be alive then. My understanding is that yes, the police had wanted to speak to Mr. Kolobong prior to his murder and then he was murdered. Your time I guess has expired. Thank you, ma'am. There you go. May it please the court, Doug Ginsberg for the Department of Justice, representing the Attorney General in this matter. Record evidence does not compel a finding that the 1992 murder of the petitioner's husband was on account of a protected ground.  I want to speak up just a little. Is that a little better? One fact of record is that we have no idea. Are you related to the Ginsberg who was on the D.C. Circuit? I am not related at all. We want justice on the Supreme Court. Resentance is startling. You look pretty good. Thank you. Go ahead. Three selling facts of record, I think. One is that nobody has any idea why the petitioner's husband was killed. Do we have any idea why the leader in the next village was killed? We don't know that either. People are killed in this country. People are killed in the Philippines. Why do human beings kill other human beings? That might suggest that the killings were other than a family feud, because there was no relationship between the two. Is that right? No family relationship. We don't know of any political relationship or any connection whatsoever between the petitioner's husband and the other individual who was killed. Was the other individual a leader in that community? Apparently they were. But there's lots of motivations that are possible. The petitioner's daughter suggested it could be somebody who was jealous or envious of the killer. Of two leaders in two communities? All of this is as to the reason that it was family or that it was jealousy are completely conjectural. Isn't that correct? Everything is conjectural. We don't have any evidence of any facts here. Were these notes trying to put the blame on the MPA? We don't even know that necessarily, because the MPA supposedly left the note. Where is the note? What did the note say? Who recorded the note? His testimony was credible. She was not found to be incorrect. But she didn't see the note. She didn't testify that she found the note. She didn't testify with respect to the note supposedly found by the neighbor. She just says, I can't even remember that I ever read such note. So we have no idea what these notes say. We don't know who found the notes. She said she was afraid. She was so afraid she just couldn't bring herself to read the note. And her neighbor read the note. So we don't know what the neighbor read. The neighbor didn't have a declaration. We don't know why there was no declaration from the neighbor. We don't know who this neighbor was. We have a lot of so-called evidence in this case which is based on rumor. And she, in the record, numerous times says it was rumor. There was rumors that the MPA was involved. Well, that rumor supposedly was not credited because the MPA went on and made very strong renunciations of their involvement, which she seemed to credit. So she says, well, if it wasn't the MPA, it must have been the government. Maybe we should be looking at some other factors here. The immigration judge said that had she not been involved in these other kind of subsequent perhaps violations of the immigration laws or fraud, he would have granted her relief, making the assumption that he found substance in these other claims. I don't think he quite said that, Your Honor, with all due respect. I think he said if he found her— It's a she. If the immigration judge otherwise found the petitioner otherwise eligible for asylum, she would have granted, at least at that point, as a matter of discretion. She wasn't saying that but for the fraud that she would have found eligibility. That's the way I read it. Maybe I'm wrong. I don't believe that's what the immigration judge found. Well, I'll go back and reread it. It says here, As the court erred in finding respondent not eligible for asylum based on a well-founded fear of persecution, if she returns to the Philippines, there's also the other matter. In this case, it's quite difficult to favorably exercise discretion where there are multiple frauds. On the other hand, respondent is the mother of an active-duty naval officer, which states the name, and the mother-in-law of another fully veteran who was also on active duty in the U.S. Navy. And because of her ties to these two men, the court would have granted the asylum application as a matter of discretion. Correct. So she would have granted it. Right, but she's just assuming that eligibility was established. If eligibility was established, then she would have considered a positive grant of discretion, but she never does that. Because of her ties, she would have granted it as a matter of discretion. Right, but she didn't get there because she found an eligibility. The mother-in-law's respondent son has indicated he is in desperate need of child care for his baby since his wife, who is also active-duty Navy and is assigned to a ship. I read that as her concluding that she would have granted asylum if it had not been for these other matters. She would have granted asylum, but for the fact that she found an eligibility, that it was a failure to establish the nexus, the on-account of. But she doesn't say that. She does say that. I think you should turn your attention to whether the fraud is disqualifying, because if I am correct in how I read the record, she would have granted the asylum except for these fraudulent. No, no, that's not what the invocation judge said. She would have granted as a matter of discretion. Remember, every asylum adjudication has two components to it. First, you have to establish eligibility. The person establishes a fear of persecution on account of a protected ground. If eligibility is established, persecution has been established, then you have to establish that you merit a favorable exercise of discretion. Well, isn't that the Attorney General's job after she finds the elements of asylum? That's correct, Your Honor. But here, there was no finding of eligibility because she failed to establish the nexus. She failed to establish that the murder or that the alleged persecution was on account of a protected ground. She had to establish that there was motivation, at least in part, and she failed to do that. And one of the other facts, getting back to my initial point about three facts, was that there was Uncle Efron. What did Uncle Efron's wild card, as Judge Clifton said, what did Uncle Efron say? Well, the only thing we know that Uncle Efron said is what he said to a federal investigator right here in Honolulu, which is that he doesn't even know Petitioner and her husband. That's the unrebutted statement of this key witness, that he doesn't even know the Petitioner or her husband. It's unrebutted because the Petitioner did not subpoena him to come in, did not seek a declaration from him to present, so all we have left unrebutted is this stark fact, a statement given to a federal investigator that he does not know the Petitioner, which is an amazing bit of evidence here because it completely goes against her account of the claim. If she claims Uncle Efron came and knocked on the door, he's basically saying that never happened. He doesn't know Petitioner. Or he's trying not to be involved. That's possible. That's a possible explanation. That's why a subpoena would have been good. Let me ask you, if we don't have that, you can come to evidence. I want to follow up on something that I'm just confused on, and I've read the portions of the decisions the first time around with what the IJ said with regard to exercise of discretion. Then when it comes back the second time in 2007, the immigration judge specifically declines to exercise discretion in the person we call the Petitioner. With regard to the discretionary waiver, the IBJ 237A1H waiver, how do the factors for the exercise of discretion in that context compare with the factors for the exercise of discretion in the asylum program context? Well, first of all, I think when he did the 237A1H discretion analysis, he went into a lot more detail. Sorry. He went into much more detail on the level of fraud. To answer the question specifically... Are the measures similar or are they different somehow? They are somewhat different standards. With the asylum, immigration judges often go more into considering the persecution as a factor, which in a 237A1H context often is not even an issue. So it is possible that you may merit discretion in an asylum context but not in an adjustment or some other type of waiver context. I think that's all that was happening here. The third fact I wanted to get to was the fact of the return trips by the Petitioner, that she and her daughter together made four return trips to the Philippines. The Petitioner once for 10 days, once for over a month. Those were under false names and part of the fraud. Is that right? Well, when she was in the Philippines, whether she was known or not, I don't think she was known in the Philippines as Lydia Vizpera. Presumably she would have been known under her own name and if traveling under an alias was enough to protect her, then apparently she doesn't need asylum in the United States. But what it does show is that... You know, we've had a number of cases where people go back, they take risks, particularly when there's death in the family. And you had that here. There was no deaths in the family. She thought her father was sick. Her daughter went back because she had to buy wedding supplies. It was not always under these extreme circumstances. In fact, she had self-deported. She's no longer in the country now. So the record does suggest that she didn't really have even a subjective fear of going back. When she needed to go back, she went back. Nothing happened. There were no threats. There were no threats after she left the country back in 1994. But wasn't there evidence that she spent nights in different places? Well, she said she did. But she also said that she went back to the home village and she stayed there for several days on three separate occasions on one of the trips. So, again, there were no threats, no problems. She has relatives who remain in the country, no apparent problems. Were there country conditions in the record? I think they were. Yes, Your Honor. What did they show? Nothing really specific to this case. Obviously, there was violence in the Philippines. A case of violence and torture. It happened, but we don't know if it's torture by the government, which would be needed to establish a torture claim. We don't know the government's involved here, which is the main problem with the petitioner's case here, that we don't know and there is really no evidence of who killed Simeon. It's as simple as that. All we have is the conjecture. Well, it's not the NPA. It must be the government, or maybe it was somebody who was jealous. Or, according to one of the news articles, there was a guns for hire that people would go out and kill people and settle scores. Just a lot of violence is suggested, but not a lot of real evidence. We have rumors that it's not the NPA. It must be the government. But, again, there's no evidence that that's the case. The government doesn't dispute that her husband was killed and that 64 bullets were in his body. It's not even clear where that evidence comes from. There's nothing in the death certificate of that. But even if that's the case, all that shows is that somebody really wanted him dead. And it doesn't say who did it or why. Do you think her husband is still alive? I don't think so. That's not suggested by the record, although everything is suggested by this record. There's a death certificate for the petitioner in this record. There were statements from her husband after the assassination. This is a record which is replete with fraud, so I suppose anything is possible. But it's not government's contention here. I think we have accepted that. So this is a record that's a complete fraud? Is that what you said? I said it's replete with fraud. I think it's time to stop. Thank you, Your Honor. Thank you. I just wanted to clear up a few points. When the government talks about how we don't know anything and he's criticizing whether notes existed or not, it's really a red herring because he's already conceded that we must accept the facts as true. As far as the fraud, this is not a typical fraud case, although the petitioner conceded that she committed fraud, identity fraud, in coming to the United States. That is entirely consistent with a refugee who fears persecution. In her return trips to the Philippines, she believed that her parents were dying and the precedent establishes that where she has a reasonable subjective fear of the death of parents, that it is not inconsistent with an asylum application. And the fact that her relatives, according to the government, have not suffered any apparent problems, her only remaining relatives in the Philippines are her parents, who are not part of the immediate Colobong family. They have a different last name. And as long as we find, with regard to your questions regarding Uncle Ephraim, as long as we find that Mr. Colobong was killed, at least in part on the protected ground where he was acting in the course of his duties, then it's reasonable to assume that his family members would suffer the same persecution. But if the spouse of the neighboring community leader who was killed, there's no evidence of threat, if he's singled out because of his position, she doesn't hold the position. There's no reason to assume that the danger extends to other members of the family for a political reason. But there were threats against her family. It's not just against her. That remains something of a mystery. But if we can find that it was at least in part, and the totality of all of the circumstantial evidence shows that it was at least in part, and then I think that the... That's not quite true either, because the standard is not whether we can find. The standard is whether the facts, the evidence, compel that finding and exclude the finding made by the agency. Frankly, I think you're right. We could find, but that's not the measure. This question is on compelling evidence. Yes, that is. But we submit that there is substantial evidence in the record, circumstantial evidence, that does compel that finding. What do the country reports show that would underpin your argument? The country reports with regard to killings by New People's Army of elected government officials? Yes. Yes, the country reports are in the record, Your Honor. What do they show? That killings of government officials by communist leaders are frequent in the Philippines. Well, if there are no further questions, I'd submit. Thank you. All right. The matter is submitted. I'll take up the next matter, which is U.S. versus Kalani Lee. Thank you, Your Honor. Thank you.
judges: Fletcher B. , Pregerson, Clifton